JAMES CLARKSON
ACTING REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center – RM 400
New York, NY 10281
(212) 336-1020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,            :
                                               :
                        Plaintiff,             :
                                               :    08 Civ. _____ ( )
            - against -                        :
                                               :
MARC S. DREIER,                                :
                                               :
                        Defendant.             :
-----------------------------------------------------------------x

**DECLARATION OF CHRISTOPHER FERRANTE IN SUPPORT OF PLAINTIFF'S APPLICATION FOR EMERGENCY PRELIMINARY RELIEF AGAINST DEFENDANT MARK S. DREIER**

I, Christopher Ferrante, pursuant to 28 U.S.C. 1746, declare as follows:

1. I am over 18 years of age and am employed as a staff accountant at the New York Regional Office of the Securities and Exchange Commission ("Commission"). I have been employed at the Commission for over seven years. In November 2008, I was assigned to assist in an investigation in connection with this action. I make this Declaration in support of the Commission's Application for Emergency Preliminary Relief against Defendant Mark S. Dreier ("Dreier").

2. I base this declaration upon the following evidence: (i) my review of certain taped telephone conversations of Dreier in which he admitted the facts set forth in

paragraph 16 below; (ii) an interview that I attended of a representative of Hedge Fund II (discussed below); (iii) my own interview of a representative of Hedge Fund I (discussed below); (iv) an interview I attended of the chief executive officer of the Developer (discussed below); (v) an interview I attended of a partner at the Developer's accounting and auditing firm; and (vi) documents reflecting and involved in the bogus transactions described below, provided to me by the Commission staff.

3. Based on my review of publicly available information, Defendant Marc S. Dreier, 58, is a resident of Manhattan, and an attorney licensed in the state of New York. He is the founder and managing partner of Dreier LLP, a 250-attorney national law firm, with its principal offices in Manhattan, and additional affiliated offices in Los Angeles and Santa Monica, California; Albany, New York; Stamford, Connecticut; and Pittsburgh, Pennsylvania.[1]

4. Since at least October 2008, Dreier has been offering the bogus securities of unwitting legitimate issuers to hedge funds. The facts set forth here detail certain of his offers and sales of the fictitious notes of one such purported issuer, a New York-based real estate development company (the "Developer") that is a former client of both Dreier LLP and Dreier himself.

5. Since at least October of this year, Dreier has approached at least three different hedge funds with an offer to sell them, at a deep discount, various short-term, unsecured promissory notes supposedly issued by the Developer. Two of the investment

---

[1] Prior to founding Dreier LLP in 1996, Dreier was the head of the litigation practice in the New York office of Fulbright & Jaworski. Before that, he was reportedly a partner at Rosenman & Colin LLP. Specializing in commercial litigation, including securities litigation, Dreier apparently received his undergraduate degree from Yale in 1972 and his law degree from Harvard in 1975.

funds agreed to purchase the notes and forwarded approximately $113.5 million to a Dreier LLP escrow account in payment. A third was offered the notes, but declined to participate. All of the offers were accompanied by fabricated and/or forged documents. For two of the investment funds, Dreier set up calls with, and provided dummy email addresses for, Dreier accomplices who posed as representatives of legitimate entities, all in an effort to convince the prospective purchasers that the deals were real. Dreier made each of the offers even though he knew or was reckless in not knowing that the Developer had never issued the phony notes, had not authorized Dreier to market them and indeed knew nothing of their existence or Dreier's offers or sales.

**Hedge Fund I**

6.      On October 13, 2004, Dreier contacted an attorney for Hedge Fund I and falsely told him that he was representing the Developer in marketing the Developer's notes. Dreier further falsely stated that the notes he was offering were currently held by institutional investors who needed to sell their investments quickly to meet various financial obligations. Dreier also falsely stated that the Developer had enlisted his help in finding new buyers for the notes so that the Developer would not have to redeem them. Dreier asked the attorney whether he had any investment fund clients who might be interested in acquiring some of the notes at the discount the current holders were willing to accept. At the attorney's recommendation, Dreier then sent Hedge Fund I various offering materials that set out the terms of an offer of the Developer's notes so that the attorney could forward them to interested clients, including Hedge Fund I. To his email to Hedge Fund I, Dreier attached information describing the Developer, a "form" note and related agreements, and "audited financial statements."

7. Dreier did not tell Hedge Fund I's attorney that the notes were bogus and were currently held by no one, that the "audited financial statements" were fabricated, or that the Developer had never issued the notes or authorized Dreier to market them, despite the fact that Dreier knew of these matters at the time of his conversation with Hedge Fund I's attorney. Hedge Fund I's attorney forwarded Dreier's offer and offering materials to Hedge Fund I.

8. Hedge Fund I's analysts began to review the possible notes purchase. In the course of their analysis, Dreier forwarded to them audit letters which bore the forged signature of the Developer's auditor, and which were printed on purported stationery of the Developer's auditing firm. Dreier did not tell anyone at Hedge Fund I that any of the documents he had provided were fabricated and/or forged, despite his knowledge of these matters.

9. As part of its due diligence, Hedge Fund I employees asked Dreier to produce a representative of the Developer who was familiar with the Developer's finances, to provide the names of the institutional investors who were selling the notes, and to furnish the names of other note holders. In response, Dreier forwarded by email four notes purportedly issued by the Developer to three separate investment funds, and included copies of Dreier LLP opinion letters, signed by Dreier, and the corporate certificates that he represented supported the original note purchases. All of the documents forwarded by Dreier to Hedge Fund I in that email were fabricated by Dreier or sent by him with knowledge that they were fabricated.

10. Also in response to Hedge Fund I's due diligence request, Dreier set up a call between Hedge Fund I's analysts and a person posing as the Developer's CEO.

4

Dreier gave the analysts the number at which the "CEO" could be reached, and during the call, the "CEO" gave them his email address and several phone numbers at which they could reach him with further questions. The true chief executive officer of the Developer did not participate in any phone calls with Hedge Fund I's analysts, and the email address and phone numbers Dreier provided to Hedge Fund I's analysts were not connected to the Developer's chief executive officer. The "CEO" Hedge Fund I's analysts spoke with was in fact a Dreier confederate, and the email address and phone numbers provided by the "CEO" were linked to Dreier and had no real connection to the Developer.

11. Each of these deceptions – the original notes and supporting documents, the contacts with imposters – was intended by Dreier to convince Hedge Fund I that the notes were real when he knew or was reckless in not knowing that they were not.

12. Ultimately, Dreier's efforts to convince Hedge Fund I that the notes were real and were good investments succeeded. On October 24, 2008, Hedge Fund I wired $83.6 million to the Dreier LLP escrow account in payment for four of the Developer's unsecured notes, purportedly paying interest of 11% to 11.5% per year and with a combined face value of $110 million. On November 7, 2008, Hedge Fund I made an additional purchase of a $25 million Developer note for $16.25 million. Hedge Fund I transferred the November purchase money to the Dreier LLP escrow account as well.

## II. Hedge Funds II and III

13. At around the same time as he was offering the notes to Hedge Fund I, Dreier was offering other phony Developer notes to Hedge Funds II and III. In statements detailed below, Dreier admitted that he made misrepresentations to Hedge Funds II and III similar to those he made to Hedge Fund I. While he was also successful

in closing sales to Hedge Fund II, Hedge Fund II convinced Dreier to return all of its investment after it confronted him with its suspicions that the notes were bogus.

14. Sometime in October 2008, Dreier learned that Hedge Fund II was interested in purchasing the Developer's notes. With Dreier's knowledge, if not at his direction, Hedge Fund II had been provided with the same offering package as Hedge Fund I, including the form of the bogus "note," the false financial statements of the Developer and its auditor's fabricated and forged opinion letters. With Dreier's permission, Hedge Fund II forwarded the offering package to Hedge Fund III to solicit its interest in participating in the purchase of the notes with Hedge Fund II.

15. Seeking additional information about the Developer's financial statements as part of its due diligence, a representative of Hedge Fund III contacted the audit partner whose purported signature appeared on the Developer's audit opinion letters and provided the audit partner with the forged audit letter. The audit partner immediately recognized that the document had been forged and that the financial statements were fabricated.

16. Dreier has confessed to the pertinent aspects of his scheme. He admitted that:

- The notes were fictitious;

- The notes had never been issued by the Developer;

- The Developer had never authorized him to market the notes;

- He or his confederates had fabricated and forged documents evidencing that the notes had been issued by the Developer to the original holder even though the original holder may never have purchased any notes issued by the Developer. In that connection, he or his confederates forged the signature of the Developer's CEO;

- The Developer's financial statements and audit opinions were fabrications; and

- He knew that that the Developer's financial statements and audit opinions had been distributed to Hedge Fund II and Hedge Fund III without disclosure that they were false.

17. Sometime shortly before Hedge Fund III discovered Dreier's fraud, Hedge Fund II, at Dreier's instruction, wired $13.5 million in payment for certain of the fictitious Developer notes to the Dreier Account. When Hedge Fund II learned of Hedge Fund III's discovery, it demanded that Dreier refund its money, and Dreier complied.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 8, 2008
New York, New York

*Christopher Ferrante*